UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                 Plaintiff,<br><br>    v.<br><br>DAYNE BECK,<br><br>                                 Defendants. | Case No. 2:12-cr-00362-APG-PAL<br><br>REPORT OF FINDINGS AND<br>RECOMMENDATION<br><br>(Mtn to Suppress - Dkt. #31) |

This matter is before the court on Defendant Dayne Beck's Motion to Suppress Physical Evidence and Statements Pursuant to the Fourth and Fifth Amendment (Dkt. #31) which was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  The court has considered the Motion, the government's Response (Dkt. #35), Beck's Reply (Dkt. #36), and the evidence and arguments adduced at an evidentiary hearing conducted October 10, 2014.

**BACKGROUND**

I.      **Procedural History.**

Beck is charged in an Indictment (Dkt. #1) returned August 7, 2012, with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).   The indictment arises out of a vehicle stop and arrest by officers of the Las Vegas Metropolitan Police Department ("LVMPD") on August 7, 2012.  Beck was driving a dark blue BMW and was initially pulled over for operating an unregistered vehicle with "Sovereign Nation" license plates at approximately 12:30 a.m. near the corner of Tropicana Avenue and Mountain Vista Street in Las Vegas, Nevada.

1    **II.      The Parties' Positions.**

2            **A.  Beck's Motion to Suppress.**

3            The motion to suppress argues that the traffic stop was an unlawful search and seizure in

4    violation of the Fourth Amendment.   Beck asserts there are inconsistencies concerning the

5    justification for the original stop in the arrest report and the officer's report.   The officer who

6    conducted the initial stop, Officer Hibbetts, wrote an arrest report that indicated he pulled Beck

7    over for failure to have a license plate light.   However, his officer's report states that Beck was

8    stopped for driving an unregistered vehicle.   The same report indicates the vehicle was registered

9    through California DMV, but the registration was suspended.   Beck requested an evidentiary

10   hearing "to determine if the initial traffic stop was valid."

11           The motion to suppress also claims that officers conducted an unlawful warrantless

12   search of his vehicle without probable cause and abused their discretion by impounding and

13   conducting an inventory search of the vehicle.   Beck argues that the traffic violation alone was

14   insufficient to justify impounding the vehicle under the Fourth Amendment, and Ninth Circuit

15   case law requires a showing that the impoundment was necessary as "a valid caretaking

16   purpose."   Citing *United States v. Cervantes*, 703 F.3d 1135, 1142 (9th Cir. 2012), Beck

17   maintains that strict reliance on state codes and police department policies regarding impounding

18   and inventory searches is "insufficient to justify an impoundment under the community

19   caretaking exception."

20           The LVMPD policy manual requires that the decision to impound a car and conduct an

21   inventory search must be done pursuant to standardized criteria which limits the discretion of the

22   officers and ensures the impoundment and inventory are legally performed and not a pretext for a

23   general exploratory search.   An excerpt of LVMPD's manual containing its vehicle impound and

24   search policy is attached as Exhibit C to the motion.   The manual provides twelve circumstances

25   that justify impoundment of a vehicle per department policy—none of which were present in this

26   case.   The motion requested an evidentiary hearing to establish Beck's contention that his vehicle

27   was legally parked in a private parking lot and that the officers abused their discretion by

28   impounding the vehicle.

1       Beck also seeks to suppress his statements made at the time of the traffic stop, claiming

2   he was subjected to custodial interrogation before *Miranda* rights were administered.  Beck

3   argues he was taken into police custody, handcuffed, and under formal arrest by the officers

4   before a search of his person or vehicle was conducted.  A patdown search of his person revealed

5   a baggy of a green, leafy substance suspected to be marijuana.  A search of his vehicle recovered

6   a backpack found in the trunk which contained approximately 4.4 grams of marijuana and a

7   firearm.  Beck was subjected to custodial interrogation when Hibbetts asked him if the gun was

8   his and if it was registered.  These were questions that the officers should have known were

9   likely to elicit an incriminating response, and therefore, any statements Beck made concerning

10  his ownership of the firearm and its registration should be suppressed.

11      **B.  The Government's Response.**

12      The government opposes the motion, asserting Officer Hibbetts conducted a valid traffic

13  stop of Beck's BMW.  The response claims that as Officer Hibbetts was traveling eastbound on

14  Tropicana Avenue near Mountain Vista, he observed Beck's unregistered dark blue BMW

15  without a license plate light traveling westbound through the side-view mirror.  Hibbetts did a u-

16  turn, pulling behind the BMW, and observed that the vehicle was not legally registered and was

17  displaying a "Sovereign Nation" license plate.

18      Hibbetts conducted a traffic stop of the vehicle and made contact with the driver on the

19  driver's side.  The black male adult, later identified as Beck, initially refused to roll down the

20  window, but then he only rolled it down approximately one inch and asked why he had been

21  stopped.  Hibbetts explained that the BMW had no license plate light and was not registered in

22  Nevada.  Hibbetts asked for Beck's identification, registration, and proof of insurance.  Beck

23  reportedly replied that he did not have to provide them because he did not break the law.

24  Hibbetts explained it was against the law to operate a vehicle on the roadway without a license

25  plate light, and Beck allegedly responded that he did not have to follow the law.  After further

26  discussion, Hibbetts again asked for Beck's identification, and Beck reportedly handed Hibbetts

27  an "Affidavit of Truth."  At this point, Hibbetts called for backup, and Officer Pacifico, Sergeant

28  Stoddard, and Sergeant Cowely responded.

1    Pacifico approached the driver's side of the BMW to make contact with Beck while the

2    other officers stood back.  Pacifico convinced Beck to roll down the window some more, and he

3    smelled marijuana.    After additional conversation, Beck eventually produced a card that

4    indicated he was a "Sovereign Citizen" by the name of Darius Lathanium.  The officers believed

5    this identification was false and conducted a records check.  Pacifico was eventually able to

6    convince Beck to get out of the vehicle.  Beck was placed under arrest for refusing to provide

7    identification and not having valid registration or proof of insurance for the vehicle.  A search

8    incident to arrest located a green leafy substance in a clear plastic bag inside the right cargo

9    pocket of Beck's shorts.  Hibbetts concluded the substance was marijuana based on his training

10   and experience and later confirmed this with a field test.  Beck's vehicle was searched because of

11   the marijuana found on Beck's person and because Pacifico detected the odor of marijuana

12   emanating from the vehicle.    Hibbetts checked the vehicle's VIN and learned that it was

13   registered to Dayne Beck in California, but the vehicle's registration was suspended.

14   An inventory search of the BMW was conducted because of Beck's arrest and failure to

15   identify himself and because the vehicle had no valid insurance, and the registration was

16   suspended.  Officer Pacifico located an orange bag in the trunk of the vehicle which contained

17   several glass smoking pipes, a small scale, an additional 4.4 grams of a green leafy substance in a

18   small, orange pill bottle, a birth certificate, medical records, and additional identification papers

19   in the name of Dayne Beck.   Officer Pacifico also found a loaded firearm with additional

20   magazines inside of the bag in the trunk.  Hibbetts asked Beck if the firearm was registered to

21   him and if it was his firearm.  Beck reportedly responded, "Yes, it's registered like my vehicle."

22   A record check reflected that the gun was not registered.  A national criminal database check of

23   "Dayne Beck" and his identifiers was conducted which revealed that Beck had a California

24   felony conviction for robbery.   Beck was eventually arrested for possession of a controlled

25   substance, felon in possession of a firearm, and for the traffic violations and was transported to

26   the Clark County Detention Center.

27   The government argues that Hibbetts conducted a valid traffic stop which developed

28   probable cause to search the vehicle for controlled substances.   The government's response

argued that an evidentiary hearing would establish that Officer Pacifico could and did smell marijuana emanating from the vehicle which, in and of itself, established probable cause to conduct a search for controlled substances.  Additionally, a search of Beck's person incident to arrest bolstered the probable cause when marijuana was recovered.  Officer Pacifico had thirteen years of law enforcement experience at the time the green leafy substance was recovered and when he detected the odor emanating from the vehicle.  Pacifico reasonably believed the green leafy substance was marijuana and that the odor emanating from the vehicle was marijuana.

Although the government claims that the police conducted a lawful search of the vehicle based on probable cause, it argues in the alternative that the search was a lawful, valid inventory search conducted according to LVMPD policy.  In this case, Beck was taken into custody, failed to identify himself, had no auto insurance, his vehicle's registration was suspended, and the vehicle was not displaying valid registration.  Under these circumstances, the vehicle could not be lawfully operated, and the impoundment and inventory search were conducted according to department policy.  Citing *Miranda v. City of Cornelius*, 429 F.3d 858 865 (9th Cir. 2005), the government argues that a vehicle impound may be proper under the community caretaking doctrine if the driver's violation of a vehicular regulation prevents the driver from lawfully operating the vehicle.

The government concedes that Beck was in custody for purposes of the requirement to administer *Miranda* warnings.  However, the government disputes that the questions Beck was asked about whether the gun was his and registered were interrogation or its functional equivalent which required *Miranda* warnings.  Interrogation means express questioning or its functional equivalent, which includes words or actions on the part of the police, that the police should know are reasonably likely to elicit an incriminating response.  The police were not aware that Beck was a convicted felon until the end of the encounter.  When Hibbetts asked Beck if the firearm was Beck's and whether or not it was registered to Beck, Hibbetts did not know Beck could not lawfully possess a firearm, and Hibbett's question was not reasonably likely to elicit an incriminating response.  Therefore, there was no *Miranda* violation, and Beck's statements need not be suppressed.

### C.  Beck's Reply.

Beck's reply reiterates arguments that the government has the burden of showing that a warrantless search and seizure of the vehicle falls under a valid exceptions to the warrant requirement, that the officers lacked probable cause to search the vehicle, abused their discretion in impounding and conducting an inventory search of the vehicle, and that Beck's Fifth Amendment rights were violated when he was interrogated without being advised of his *Miranda* rights.

### III.    Evidentiary Hearing.

At the evidentiary hearing, the government called Officer Kristopher Hibbetts and Vincent Pacifico to testify.  Beck called defense investigator Al Tobin.  The court canvassed Beck to determine whether he had been advised of his right to testify.  Beck acknowledged that after conferring with counsel, he was well aware that he had the right to testify, and the right to decline to testify, that his silence could not be used against him, and that it was his decision after conferring with counsel not to testify.

### A.  Testimony of Officer Hibbetts.

Officer Hibbetts has been employed by LVMPD for four years and was on duty on August 7, 2012, at approximately 12:30 a.m., in the area of Tropicana and Mountain Vista. Hibbetts was traveling eastbound and observed a BMW driving westbound.  It was one of the only cars on the road, and Hibbetts saw that it did not have a license plate light, which is a violation of the Nevada traffic code.  Hibbetts did a u-turn, pulling behind the BMW to investigate.  The BMW was stopped at a traffic light.  Hibbetts noticed the BMW was not properly registered, *i.e.,* it was not displaying a valid license plate.  Hibbetts had never seen the plate before from Nevada or any other state, and it had a number of unusual emblems and markings.  Hibbetts conducted a traffic stop for unregistered vehicle and lacking a license plate light.

Hibbetts pulled the BMW over on the northwest corner of Tropicana and Mountain Vista. He approached the vehicle on the driver's side but could not see inside because it had dark, tinted windows.  Hibbetts got the driver to roll down the window a crack and attempted to engage the

driver in conversation.  Hibbetts backed up a little because he could not see the driver's hands and spoke to the driver a little further back than usual.  He asked the driver for his driver's license, registration, and proof of insurance.  Hibbetts spoke to the driver for approximately two or three minutes by himself.  During this initial conversation, Beck stated that he was a Moor, that his vehicle was a vessel, and that he did not have to follow traffic laws or other laws.  As a result, Beck called for an additional unit and a supervisor.  Before calling for backup, Beck handed Hibbetts an Affidavit of Truth which did not identify the driver.

Pacifico was the first officer to respond to the call for backup, and he arrived in about two or three minutes.  Two sergeants arrived a little later.  Hibbetts briefly told Pacifico the reason for the stop and the details of his encounter with the driver.  Pacifico took over and approached the driver's side of the vehicle while Hibbetts remained further back behind the car.  Hibbetts took the Affidavit of Truth and tried to identify the driver from a records check but found nothing.

Pacifico was eventually successful in getting Beck to roll down his window a little more. Hibbetts did not recall Pacifico making a statement about smelling something from the BMW. At some point Hibbetts ran the VIN number of the vehicle and found out it was registered to Dayne Beck.  Hibbetts did not recall at what point Pacifico got Beck out of the car, but believed it took approximately twenty minutes.  Hibbetts believed that he ran the VIN number of the vehicle after Beck got outside the vehicle.  At some point, Pacifico said he could smell a controlled substance.  Pacifico did a vehicle search which Hibbetts witnessed.  Hibbetts was sitting in the vehicle trying to pay attention to Beck while Pacifico conducted a standard search of the vehicle from one side to the other and inside the compartments.  A firearm was recovered from a backpack in the trunk.  After the firearm was recovered, Hibbetts asked Beck if the firearm was his.  Hibbetts had run a records check to identify Beck, but "hadn't found him in our system."[1]  Hibbetts later learned that Beck was an ex-felon out of California.

---

[1] The testimony was unclear, but it appears Hibbetts was referring to a records check on the name Darius Lathanium from a card Beck produced.  From later testimony, it is clear that the officers did not know the name Dayne Beck until after they examined documents in that name recovered from the backpack in the trunk of the vehicle.

Hibbetts estimated that Pacifico and Beck talked for approximately twenty to twenty-five minutes before Beck got out of the vehicle.  Hibbetts also estimated he had been at the scene of the traffic stop for about five minutes before Pacifico arrived.  Marijuana was found on Beck's person, and a green leafy substance was recovered from the backpack with a pipe and scale.  The firearm was recovered from the same backpack.

On cross-examination, Hibbetts testified that he saw the BMW driving westbound by looking in his rearview mirror and noted that it did not have an illuminated license plate.  He therefore did a u-turn and stopped the vehicle at the light westbound on Tropicana.  He did not recognize the license plate on the vehicle as one he had ever seen before and called the stop in as an unregistered vehicle.  The only way to tell if a registration is valid is to run the VIN number.  If the vehicle is displaying a license plate, it can be run through LVMPD's system.  The only other way to confirm registration is to run the vehicle's sticker.

Hibbetts identified Defendant's Exhibits A and B as photographs of the intersection of Tropicana and Mountain Vista, and the parking lot of the Winchell's doughnut shop, where Beck pulled over, respectively.  Hibbetts waited to pull Beck over until the light changed.  Beck pulled forward into the parking lot.  The vehicle was not impeding traffic and was on private property.  Hibbetts pulled his patrol vehicle behind Beck's car at an angle so that Beck could not leave.

Beck eventually rolled down the window about one inch.  Hibbetts pointed his flashlight inside the window, but the windows were so tinted Hibbetts could only see Beck's silhouette.  Hibbetts was unable to see that the driver was a black male adult and could not see the driver's hands or eyes.

Hibbetts stepped back behind the driver's door, near the rear door of the driver's side because he could not see inside.  At the time, Hibbetts had only been a police officer for approximately two years and was without a partner.  He had spoken with Beck for about five minutes and backed up because Beck was uncooperative.  Hibbetts did not smell any odor of marijuana emanating from the vehicle.  Hibbetts requested backup from the radio on his shoulder and Pacifico was the first to arrive one to two minutes after he requested backup.  Hibbetts

///

1   requested another unit and a supervisor.  Pacifico was closest, so he got the call.  Two sergeants

2   riding together, Stoddard and Cowely, arrived one to two minutes after Pacifico.

3          Hibbetts stepped back to the back of Beck's car while Pacifico took over.  Hibbetts could

4   hear the conversation between Pacifico and Beck, but he did not recall specifics except that

5   Pacifico was trying to get Beck to cooperate.  Hibbetts did not specifically recall, but did not

6   think, that Pacifico was able to get identification from Beck.  Hibbetts stayed back until Beck

7   rolled down his window slightly more and then took the piece of paper Beck gave Hibbetts and

8   tried to identify the driver from it.

9          Hibbetts wrote an arrest report and an officer's report for this encounter.  Neither report

10  says that Pacifico got Beck to roll down his window further.  Hibbetts spoke with Pacifico before

11  testifying and has talked with Pacifico about this case a lot before he received the subpoena.  It

12  was a memorable encounter, and they have talked about it approximately three to four times.

13  Hibbetts and Pacifico also talked about the stop after receiving the subpoena and discussed

14  whether Beck rolled down the window further.

15         Pacifico eventually got Beck to get out of the car.  Beck locked the door behind him.

16  Beck was handcuffed by Pacifico and patted down.  The pat down recovered a baggie with a

17  green leafy substance which Pacifico put on the hood of the patrol car.  The baggie was tied at

18  the top and sealed.  Neither officer administered *Miranda* warnings to Beck, and no preliminary

19  field test was conducted of the green leafy substance recovered from Beck's person when it was

20  initially recovered.

21         Beck resisted and tried to pull away as Pacifico was attempting to handcuff him.

22  Hibbetts described the encounter as "a dynamic situation."  Hibbetts did not recall if he had a

23  field test kit in the car or if the green leafy substance was tested at the scene or later at the station

24  while impounding the vehicle.

25         The vehicle was searched after Beck's arrest.  Hibbetts was in his patrol car, with Beck

26  placed in the front.   The sergeants were observing as Pacifico searched the passenger

27  compartment of the car.  Nothing was recovered in the passenger compartment.  Hibbetts ran the

28  VIN on the vehicle sometime after Beck was out of the car although Hibbetts did not recall

exactly when he did so.  Hibbetts learned that the vehicle was registered to Dayne Beck, but he did not know who Beck was.  The VIN was run through his mobile data terminal and Nevada records.  Hibbetts also ran the name Dayne Beck through Nevada records and found nothing.  At the time of this stop, he did not have the ability to check other non-Nevada databases and was required to call LVMPD records.

Hibbetts questioned Beck after he was under arrest but had not provided *Miranda* warnings.  At the time he asked Beck whether the firearm was his and registered, Hibbetts was aware that Clark County regulations require a firearm to be registered.  He was also aware that it is against Nevada law for a person addicted to controlled substances to possess a firearm.

Hibbetts did not observe Beck drive erratically or have any indication that Beck was driving under the influence when Hibbetts decided to pull the vehicle over.  Beck pulled into a parking space and was legally parked.

On re-direct, Hibbetts testified that Beck's vehicle was unregistered because Nevada law requires it to display a valid license plate.  The license plate usually has a sticker on it that shows if the registration is current.  The plate on Beck's car was not a valid license plate, and the vehicle was not displaying a temporary tag.  The plate on the vehicle had an exorbitant amount of numbers and was unlike any other license plate he had ever seen before which is why Hibbetts believed it was not a lawful license plate.

Hibbetts was at the driver's side door approximately two feet from the vehicle when he first approached.  Beck cracked the window a bit.  Hibbetts believed, based on his training and experience, that the green leafy substance found in Beck's pocket was marijuana.

### B.  Testimony of Officer Pacifico.

Officer Pacifico has been employed by LVMPD for fifteen years and was on duty on August 7, 2012, when he heard a radio call requesting another officer near Tropicana and Mountain Vista.  The call over the radio indicated the individual was refusing to provide identification, and the officer was requesting another officer and a supervisor.  When Pacifico arrived, he spoke briefly with Hibbetts, who said the driver was refusing to roll down his window and identify himself.  The vehicle did not display a valid license plate.  There is no Sovereign

Nation or Moor Nation license plate, and the vehicle was being operated unlawfully.  Pacifico decided to take over and made contact with the driver whose window was cracked approximately one-half to one inch.  The driver was very argumentative and uncooperative, and stated he did not have to follow our laws and rules.  Beck continuously called his vehicle a vessel.  Pacifico talked with Beck for twenty to twenty-five minutes.  At one point during the conversation, Beck produced an identification card in the name of Darius Lathanium.  Hibbetts ran the identification and found nothing in LVMPD records under this name.

Pacifico could hardly hear the driver and could not see him, so he put his face very close to the window.  When Pacifico got close, he could smell marijuana and relayed this information to Officer Hibbetts.  Pacifico told Beck that the police were not going anywhere, and Beck eventually complied and got out of the vehicle.

Beck immediately took the keys and locked the vehicle, rolling up the window.  Pacifico told Beck to place the keys on the car.  At this point Pacifico was going to arrest Beck for failure to identify himself and driving an unregistered vehicle.  Pacifico asked Beck to put his hands behind his back.

Pacifico could have issued a citation instead of arresting Beck.  However, he decided to arrest Beck because Beck refused to identify himself, the officers did not know who he was, and they could not issue a John Doe citation.  Beck presented what Pacifico believed was a fake identification document in the name of Darius Lathanium and repeatedly stated he did not have to abide by our laws, so Pacifico believed it was unlikely Beck would honor any agreement to appear in court on the citation.

Pacifico tried to put Beck's hands behind his back to handcuff him, and Beck quickly reached for his pants pocket.  Pacifico thought Beck was reaching for a weapon, and all four officers at the scene responded.  A baggy with a green leafy substance was retrieved from the pocket.  It looked like and smelled like marijuana.

After the marijuana was recovered from Beck's person, Pacifico told Hibbetts what he had found and that he was going to search the vehicle.  The marijuana recovered from Beck corroborated Pacifico's suspicion that there was marijuana and paraphernalia in the vehicle.

Pacifico searched the passenger compartment of the vehicle and found nothing.  In the trunk, he found a number of items inside an orange backpack.  There was a green leafy substance in an orange pill bottle.  Glass smoking pipes, one of which had burned residue in it, were also recovered from the backpack.  The glass pipe with burned residue indicated someone had smoked from the glass pipe recently.  A firearm was also found in the backpack along with a number of papers, including medical records with a date of birth and social security number in the name of Dayne Beck.

Photos of the items recovered were marked and admitted as government's Exhibits 1 through 4.  At the time the firearm was recovered from the backpack, the officers had not been able to identify Beck.  Pacifico had not yet examined the pieces of paper found in the backpack. Beck was standing in the front of the patrol vehicle while Hibbetts asked Beck about the firearm. When Hibbetts asked Beck whether the firearm was his and registered, neither officer had been able to identify Beck.  A short while later, the officers went through the paperwork recovered from the backpack, got the name from it, and called in a records check.  However, the officers were still not sure that the Defendant was Dayne Beck from the description provided in the records check.

On cross-examination, Pacifico testified that when he approached the driver's side of Beck's vehicle, the window was rolled down only a crack, and he could barely see inside despite the fact that the two takedown lights on the patrol vehicle and spotlights were aimed at the BMW.  Pacifico could not see the driver's hands which is why he was so close to the window to observe if there were any weapons.  Pacifico put his face against the window and talked to the driver for twenty to twenty-five minutes.  The stop was made at approximately 12:30 a.m.  He received the call for assistance at approximately 12:35 a.m., and arrived between 12:37 and 12:40 a.m.  Sergeants Stoddard and Cowely arrived a short time later.

Hibbetts completed the reports because it was his stop.  Pacifico has spoken with Hibbetts about this stop.  For a few days after, the stop was discussed at briefings and not again until after a subpoena was received.  Pacifico spoke with Hibbetts briefly about the facts and what happened.

1    Pacifico still works patrol in this area.  He estimated that in the past two years, he has
2    conducted approximately two hundred stops.  He remembered this case well.

3    At some point during the conversation with Beck, Pacifico got Beck to roll down the
4    window a little bit more, perhaps a half an inch to an inch more.  Immediately on getting close to
5    the vehicle, Pacifico could smell the distinctive odor of marijuana because he "placed my head
6    right up there."

7    When Beck initially exited the vehicle, he opened the door, took the keys, and locked it.
8    Pacifico agreed that Beck did not consent to a search of his vehicle.  Pacifico arrested Beck,
9    patted him down, and did not advise him of his *Miranda* rights at any time.  Pacifico could smell
10   marijuana from the baggie recovered from Beck before it was field tested.  Pacifico did not
11   suspect that Beck was under the influence, did not notice bloodshot or watery eyes, and did not
12   ask Beck to perform field sobriety tests.

13   Pacifico completed the form for the field test of the marijuana that was found in the
14   backpack in the trunk.  The field test for this marijuana was done at the scene.  Nothing of
15   evidentiary value was found in the passenger compartment of the vehicle.  Pacifico identified
16   Exhibit D, which was admitted into evidence as the impound report for Beck's vehicle.  The
17   decision to impound the vehicle was made because the driver was arrested, and the vehicle was
18   unregistered.  Pacifico did not know the vehicle's registration was suspended.

19   Pacifico is familiar with the LVMPD policy manual and provisions regarding
20   impoundment of vehicles.  He believes that the vehicle impound was allowed under department
21   policy.

22   The marijuana found in the pill bottle was also in a plastic baggie, which may have been
23   tied but was not sealed.  From the smell, Pacifico believed it was marijuana.

24   On re-direct, Pacifico testified that he could smell marijuana in the pill bottle even though
25   it was in a plastic bag.  The vehicle was impounded because officers were not certain the driver
26   was Dayne Beck.  Additionally, the driver "somewhat resisted" by reaching in his pocket, and
27   Pacifico did not feel good about uncuffing the driver to have him sign a towing sheet.  Beck was
28   completely uncooperative, and Pacifico did not believe that Beck would sign the tow release

1   form.  Additionally, the vehicle was not validly registered anywhere, and it would be unlawful

2   for anyone to drive the vehicle away other than a towing company.

3       On re-cross, Pacifico acknowledged that he did not ask if Beck would sign the tow sheet

4   but reiterated that he was not certain the driver was Beck.

5                           **C.  Testimony of Al Tobin.**

6       Mr. Tobin testified that he has been an investigator for the Federal Public Defender's

7   Office for approximately twenty years.  His duties include interviewing witnesses, analyzing

8   cases, and obtaining records.  He submitted a records request to California DMV for Beck's

9   BMW.  Certified copies of four pages of the records received from California DMV were

10  marked and admitted as Exhibit G.  Tobin reviewed the California DMV documents and

11  conducted a follow up investigation by calling the California DMV records division to ask about

12  specific entries in the documents.  The California DMV employee told Tobin that Beck's BMW

13  was validly registered for the period between February 8, 2012, through February 8, 2013.  An

14  April 12, 2012, entry refers to a prior suspension.  A May 4, 2012 code "FOO" is a code

15  reflecting a transfer of ownership.  The last page of Exhibit G is an ownership and registration

16  document which reflects registration was issued May 1, 2012, and expired February 8, 2013.

17      On cross-examination, Mr. Tobin testified that he was told by an employee in the

18  California DMV records division that the April 5, 2012, entry reflecting a prior suspension

19  indicated that some paperwork was missing.  However, it was Mr. Tobin's understanding based

20  on his conversation with the DMV employee that the entry did not indicate a suspended

21  registration.  He asked the person at DMV a number of questions "because it was kind of

22  confusing to me."  The DMV employee also told Tobin that the April 5, 2012, entry did not

23  mean that the registration was suspended.  Mr. Tobin did not know the name of the person with

24  whom he spoke.  Mr. Tobin also acknowledged that he does not know what California DMV

25  computer records would have been available to the officers who conducted this stop.

26      **IV.    Discussion.**

27      The Fourth Amendment secures "the right of the people to be secure in their persons,

28  houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.

The Fourth Amendment protects reasonable and legitimate expectations of privacy.  *Katz v. United States*, 389 U.S. 347 (1967).  The Fourth Amendment protects "people, not places."  *Id*. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

### A.  Traffic Stop.

The Fourth Amendment prohibition against unreasonable searches and seizures extends to an investigatory stop of a vehicle. *United States v. Sigmond–Ballesteros,* 247 F.3d 943, 946 (9th Cir.2001). An officer making an investigatory stop of a vehicle "must have at least reasonable suspicion of criminal misconduct before detaining a driver." *United States v. Rojas– Millan,* 234 F.3d 464, 468 (9th Cir.2000). Reasonable suspicion is defined as "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Rojas–Millan,* at 468–69. If an officer does not have reasonable suspicion to conduct a traffic stop, it violates the Fourth Amendment, and any evidence obtained as a result of the stop must be suppressed as the fruit of the poisonous tree. *See United States v. Thomas,* 211 F.3d 1186, 1192 (9th Cir.2000).

Courts look at the totality of the circumstances on a case-by-case basis to determine whether reasonable suspicion existed.  *See United States v. Cortez,* 449 U.S. 411, 417 (1981). Investigating officers are entitled to draw on their training and experience "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *United States v. Arvizu,* 534 U.S. 266, 272 (200).  The Supreme Court has recognized that "the concept of reasonable suspicion is somewhat abstract."  *Id.*  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong,* 224 F.3d 1136, 1140 (9th Cir.2000).   The Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot, and observations and factors that are by themselves consistent with innocence may collectively amount to reasonable suspicion.  *Id.* at 273 (internal quotation and citations omitted).  As long as there is an objectively reasonable basis to perform a traffic

/ / /

1    stop, the stop will be permitted by the Fourth Amendment.  *See Whren v. United States*, 517 U.S.

2    806, 813 (1996).

3         It is undisputed that Beck's BMW was not displaying a valid license plate at the time

4    Hibbetts conducted the traffic stop.  The BMW displayed a Sovereign Nation license plate with

5    "an exorbitant amount of numbers" which Hibbetts testified was unlike any valid license plate

6    issued by Nevada or any other state.  Beck does not dispute that Nevada law requires a vehicle to

7    be licensed, registered, and displaying a valid license plate.  Rather, the motion to suppress

8    challenges the validity of the initial stop because of perceived inconsistencies between Officer

9    Hibbetts' arrest report and officer's report.  The officer's report indicates Hibbetts "conducted a

10   vehicle stop on an unregistered dark blue BMW with Sovereign Nation plate displayed."  *See*

11   Officer's Report, attached as Exhibit A to the motion to suppress.  The arrest report indicates that

12   Hibbetts conducted a traffic stop after observing "an unregistered dark blue BMW 548i without a

13   license plate traveling westbound on Tropicana, near Mountain Vista."

14        The court found Officer Hibbetts' testimony credible that his attention was initially

15   drawn to the BMW because it was one of the only cars on the road at that hour, and from looking

16   in his rearview mirror, he observed the license plate was not illuminated.  The court found

17   Hibbetts credible that he did a u-turn, pulled behind the vehicle to investigate, and observed the

18   Sovereign Nation license plate as the BMW was stopped at the light.  Hibbetts explained that he

19   called the stop in as an unregistered vehicle because he did not believe the Sovereign Nation

20   plate on the vehicle was valid or lawful.  The court finds Hibbetts had reasonable suspicion to

21   conduct a traffic stop and that the initial traffic stop did not violate Beck's Fourth Amendment

22   rights to be free from an unlawful seizure.

23                **B.  Beck's Arrest.**

24        Beck does not dispute that he failed to produce a valid driver's license, registration, or

25   proof of insurance at the time of the stop.  He does not dispute that he produced fake

26   identification in the name of Darius Lathanium.  Beck also does not claim that his arrest was

27   unlawful.  Rather, he challenges the post-arrest warrantless search of his vehicle.

28   / / /

### C.  Search of the Vehicle.

The government claims that the officers had probable cause to search the vehicle. Alternatively, the government claims that because the vehicle could not be lawfully driven without valid license plates and proof of insurance, that the search of the vehicle was justified as an inventory search prior to impounding the vehicle in accordance with LVMPD policy.

### 1.  Probable Cause Determination.

A warrantless search of a vehicle is per se unreasonable under the Fourth Amendment, subject to only a "few specifically established and well-delineated exceptions."  *United States v. Cervantes,* 703 F.3d 1135-1138-39 (9th Cir. 2012) (citing *Katz v. United States,* 389 U.S. 347, 357 (1967)); *United States v. Brown,* 563 F.3d 410, 414 (9th Cir.2009) (citing *United States v. Murphy,* 516 F.3d 1117, 1120 (9th Cir.2008) (internal citation omitted)).  The government bears the burden of establishing a warrantless search or seizure falls within one of these exceptions. *Cervantes,* 703 F.3d at 1141.

The automobile exception to the warrant requirements allows a vehicle to be searched without a warrant if the police have probable cause to believe the vehicle contains contraband or other evidence of criminal activity.  *Id.* at 1139 (citing *California v. Acevedo,* 500 U.S. 565, 580 (1991)); *United States v. Ross,* 456 U.S. 798-820-21 (1982).  The rationale for the automobile exception is that vehicles are mobile, can be driven away before a warrant may be obtained, and because there is a lesser expectation of privacy in vehicles traveling openly in public view. *California v. Carney,* 471 U.S. 386, 390 (1985).  Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances."  *Dawson v. City of Seattle,* 435 F.3d 1054, 1062 (9th Cir. 2006 (citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).  Probable cause is "a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules."  *Gates,* 462 U.S at 232.  Probable cause does not deal with hard certainties, but with probabilities.  *Id.* at 241.

The odor of marijuana emanating from a vehicle establishes sufficient probable cause to search the vehicle.  *See United States v. Parker,* 919 F. Supp. 2d 1072, 1080 (E.D. Cal. 2013)

1    (citing *Maryland v. Dyson,* 527 U.S. 465, 467 (1999); *United States v. Ojeda-Rodriguez,* 502

2    F.2d 560, 561 (9th Cir. 1974); *United States v. Barron,* 472 F.2d 1215, 1217 (9th Cir.1973).  If

3    the police have probable cause to believe a vehicle contains contraband, a warrantless search of

4    every part of the vehicle and its contents as might conceal the object of the search is justified.

5    *Ross*, 456 U.S. at 825, *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999).

6         Counsel for Beck challenges the credibility of Officer Pacifico that he could detect an

7    odor of marijuana emanating from Beck's BMW for several reasons.  First, Hibbetts was the

8    initial officer on the scene and did not claim he could detect an odor of marijuana emanating

9    from the vehicle.  Second, counsel for Beck argues it is not credible to believe that an

10   experienced police officer confronted with an uncooperative driver who had only rolled his

11   window down a crack would put his face up to the window exposing himself to a potentially

12   dangerous situation.  However, Hibbetts testified the driver only cracked the window slightly and

13   that he stood back farther than usual behind the driver's side because he could not see the driver

14   or his hands and he was alone.  After Pacifico arrived, Hibbetts stood back even further allowing

15   Pacifico to take over.  It is therefore understandable that Hibbetts did not detect an odor of

16   marijuana, but Pacifico, who got closer and got Beck to roll the window down and bit more did.

17        The court found Officer Pacifico credible that he was eventually able to get Beck to roll

18   down the window an additional half inch to one inch and put his face up against the window

19   because he had a hard time hearing Beck and because he wanted to get as close as possible to see

20   if Beck had any weapons in the vehicle.

21        Officer Pacifico testified that at the time of the stop, he had been a police officer for

22   thirteen years and recognized the odor of marijuana based on his training and experience.  A

23   police officer is entitled to rely on his training and experience in drawing inferences from the

24   facts he observed as long as his inferences are grounded in objective facts capable of rational

25   explanation.  *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996).

26        Pacifico's detection of the odor of marijuana emanating from Beck's vehicle constituted

27   sufficient probable cause to justify a warrantless search of the vehicle and any contents of the

28   vehicle that might conceal marijuana and drug paraphernalia.  However, there were other factors

present bolstering the probable cause to conduct a warrantless search of Beck's BMW under the totality of the circumstances. Beck refused to identify himself or produce a driver's license, proof of insurance, or registration for the vehicle. He eventually produced fake identification in the name of Darius Lathanium. Both officers testified that he referred to his vehicle as a vessel, stated he was a Moor, and did not have to follow the laws. Refusing to roll down the window, then rolling it down only a crack contributed to the officers' suspicion. When Beck finally got out of the vehicle after being told the police were not going to go away, Pacifico attempted to handcuff him. The uncontroverted testimony is that Beck initially resisted, tried to pull away, and reached for his front shorts pocket. Pacifico was concerned he was reaching for a weapon. A pat down recovered a baggie of green leafy substance from Beck's shorts pocket which Pacifico recognized, based on his training and experience, as marijuana. Under the totality of the circumstances presented here, the court concludes the officers had probable cause to conduct a search of Beck's BMW for marijuana and drug paraphernalia.

## 2.  Impoundment of Beck's Car & Inventory Search.

Alternatively, the government asserts that even if there was not probable cause to search the vehicle, the search was conducted as a lawful inventory search after Beck's car was impounded because it could not be operated lawfully. The government asserts the car's impoundment was proper under the community caretaking doctrine, and the inventory search was conducted in accordance with LVMPD's policies and procedures. Beck asserts that impoundment of the car was not justified by any of the twelve reasons stated in LVMPD's policy manual, and was not justified under the community caretaking doctrine.

Inventory searches have been held constitutional if they are conducted in accordance with the standard procedures of the agency conducting the search or come under another exception to the Fourth Amendment warrant requirement. *United States v. Ramos-Oseguera*, 120 F.3d 1028, 1036 (9th Cir. 1997), *overruled on other grounds by United States v. Nordby,* 225 F.3d 1053 (9th Cir. 2000). Inventory procedures protect an owner's property while it is in the custody of the police, ensure against claims of lost, stolen, or vandalized property, and guard the police from danger. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987). The Supreme Court has held that

1    standardized criteria or established routine must regulate opening containers found during

2    inventory searches so than an inventory search is not used as a pretext for general rummaging to

3    discover incriminating evidence.  *See Florida v. Wells,* 495 U.S. 1, 4 (1990).  The policy or

4    practice of a law enforcement agency governing inventory should be designed to produce an

5    inventory; the individual police officer must not be allowed so much discretion that an inventory

6    search becomes a "purposeful and general means of discovering evidence of a crime." *Id.*

7            The government's response to the motion to suppress argues the search was justified as

8    an inventory search pursuant a valid impoundment because the car could not be legally driven.

9    Neither the government's written response, nor argument at the evidentiary hearing identified

10   which of the twelve grounds stated in the Department's policy manual the government relies

11   upon to justify the impoundment.  Pacifico testified that he believed he followed Department

12   policy in impounding Beck's vehicle.  The impound report Pacifico filled out indicates the car

13   was impounded because "driver arrested."  *See* Impound Report, attached as Exhibit D to motion

14   to suppress and which was marked and admitted as Defendant's Exhibit D at the evidentiary

15   hearing.   LVMPD's vehicle impound policy outlines twelve circumstances that justify

16   impounding vehicles.  Impoundment is authorized "whenever a driver is arrested and is in no

17   physical or mental condition to turn the vehicle over to the custody and care of a relative or

18   friend."  *See* excerpts of LVMPD's Manual at 5-204.06 attached to the Motion to Suppress as

19   Exhibit C, and which was marked and admitted as Defendant's Exhibit E at the Evidentiary

20   Hearing.  The policy requires the circumstances to be explained in the vehicle impound report or

21   arrest report.  *Id.*  Hibbetts' officer's report indicates the vehicle was "towed based on the fact

22   that the subject was under arrest and because a records check of the VIN showed the registration

23   as suspended through CA DMV."  It is undisputed that the vehicle was legally parked in a

24   private parking lot.  Another provision of LVMPD policy allows a vehicle impound "in

25   accordance with the prescribed authority and conditions defined in the Las Vegas City Code,

26   Clark County Ordinances, and Nevada Revised Statutes."  However, neither officer testified

27   about any city code, county ordinance, or Nevada Revised Statue that authorized the

28   impoundment of Beck's vehicle for failing to display a valid license plate, or provide proof of

insurance and registration.  Similarly, the government's response does not cite any applicable code, ordinance or statute authorizing impoundment.

Even if the impound was not properly conducted according to LVMPD's Manual, the Ninth Circuit has recognized that an impoundment may be proper under the community caretaking doctrine if the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle, and it is necessary to remove the vehicle from an exposed or public location.  *See Miranda v. City of Cornelius,* 429 F.3d 858, 865 (9th Cir. 2005) (citing *United States v. Gutierrez,* 995 F.2d 169, 171 (9th Cir. 1993) (both cases finding where defendant had no valid driver's license, he could not drive his vehicle away).  However, a decision to impound a vehicle that is not consistent with the police's role as "caretaker of the streets" may be unreasonable.  *Id.* (internal citation omitted).  The Ninth Circuit has found that in determining whether to impound a vehicle after a driver has violated a vehicle regulation, a police officer must consider the location of the vehicle and whether the vehicle was actually "impeding traffic or threatening public safety and convenience" on the streets such that impoundment was warranted.  *Id.* (citing *South Dakota v. Opperman,* 428 U.S. 364, 371 (1976)).

An officer cannot reasonably order an impoundment in situations where the location of the vehicle does not create any need for the police to protect the vehicle or to avoid a hazard to other drivers.  *Id.* (internal citation omitted).  Here, Beck does not dispute that he failed to provide valid driver's license, proof of insurance registration, and that the vehicle was not displaying a valid license plate.  However, the Impound Report and the testimony of both officers establish that Beck's car was lawfully parked in the parking lot of a Winchell's Donuts.  The court finds the government has not met its burden of establishing impoundment was required under the caretaking doctrine.  There is no testimony in the record that would support a finding that the vehicle was impeding traffic or threatening public safety and convenience where it was parked.

The impoundment of a vehicle is a seizure within the meaning of the Fourth Amendment. *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005).  The government has the burden of justifying a vehicle impoundment under one of the exceptions to the warrant

requirement.  *Id.*  Neither officer testified that impoundment of the vehicle was necessary to protect it from vandalism or theft, or provided any public safety rationale for the impoundment.  In *Cornelius*, the Ninth Circuit found that the purpose of a community caretaking function is to remove vehicles that are presently impeding traffic or creating a hazard, and that the need to deter a driver's unlawful conduct was insufficient, of itself, to justify a tow under the caretaker rationale.  *Id*. at 866.  In short, the court finds the government has not met its burden of establishing that the impoundment of Beck's vehicle was done pursuant to LVMPD policy, or justified under the caretaking doctrine and this record.

### D.  Beck's Statements.

It is undisputed that Hibbetts asked Beck whether the gun recovered from the backpack in the trunk of his vehicle belonged to him and was registered.  It is undisputed that at the time the question was asked, Beck was under arrest for failure to identify himself and provide proof of driver's license, registration and insurance.  It is undisputed that incident to his arrest, a pat down was conducted and a green leafy substance officers believed was marijuana was recovered from his shorts.  Finally, it is undisputed that Beck did not receive *Miranda* warnings before he was asked about the gun.

The government has the burden of establishing, by a preponderance of the evidence, that a defendant waived his protection against self-incrimination under *Miranda* before an incriminating statement may be admitted in evidence.  *See Colorado v. Connelly,* 479 U.S. 157, 158 (1986).  The government has the burden of establishing compliance with *Miranda*, or if *Miranda* warnings were not given, that an exception applies.  In this case, the government claims that Hibbetts' questions about the gun did not constitute custodial interrogation which the Supreme Court has defined as express questioning or its functional equivalent.  However, the Supreme Court has held that express questioning or its functional equivalent consists of words or actions on the part of the police "that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis,* 446 U.S. 291, 303 (1980).

The government argues that Hibbetts' questions were not custodial interrogation or its functional equivalent because at the time the questions were asked, the officers were not aware

that Beck was a convicted felon.  Therefore, the questions were not reasonably likely to elicit an incriminating response.  However, Hibbetts testified that at the time he asked Beck these questions he was aware that the Clark County ordinance required registration of a handgun.  The court therefore finds that Hibbetts had reason to know that his questions about whether the gun belonged to Beck, and if so, if it was registered, was reasonably likely to elicit an incriminating response.  Beck had not received *Miranda* warnings, and his response to these questions must therefore be suppressed.

For the reasons stated,

**IT IS RECOMMENDED** that:

1.  Beck's Motion to Suppress Physical Evidence Seized from his Vehicle be **DENIED**.

2.  Beck's Motion to Suppress his un*Mirandized* statements be **GRANTED**.

Dated this 14th day of November, 2014.

Peggy A. Leen
United States Magistrate Judge

- 23 -